The first case on the calendar is Bank of America v. New England Quality Service. Thank you, Your Honors. May it please the Court, I'm Shannon Bertrand. I represent the appellants known collectively in this matter as NEQS, also the sole individual defendant Kevin Elnicky, who is in the courtroom today. The Bank of America waived its right to claim a default on the basic fixed charge coverage ratio because of the prior dealings of the parties, and the court below erred... Because you had been in default of that covenant for some time and they hadn't blown the whistle on it, that means that they've forfeited the right to enforce it? Well there's two points there, Your Honor. First of all, there had been an implied waiver of that ratio based upon the fact that additional funds had been extended to NEQS without an accompanying change in the financial position, and the bank knew or should have known that at the time it extended such loans that the ratio could not be met. And in fact... This would really be an appalling rule for business, because it would mean that any time a lender has included in the loan documents these kinds of conditions that you need to maintain ratios and so forth, the minute you fall in default of them, the bank has got to blow the whistle and bring the whole house down, and can't keep things going and see if you can straighten it out for risk of being held to have forfeited the right to enforce the term. And that is precisely what NEQS had hoped that the bank would do when they issued the initial notice of a default. The course of dealings between the parties had involved routine waivers of other defaults, and in light of those routine waivers, there'd been a course of conduct between the... So you're saying if you give any waivers with respect to default, then you can't enforce any other defaults that occur? There was never an express waiver of the ratio default, right? That had never happened? Not of this specific ratio default. There had been a... You're suggesting if you waive other defaults that you're waiving all of them for... You can't claim any defaults then. That's what you're suggesting. Well, but I'm not suggesting that there can never be a claim of a default. I would just note that there had been a previous waiver of a ratio default, as you will see in the briefs, the third waiver. It was... Weren't those waivers, they were specific in writing, with the rationale? Yes. There had been... There had been... Occasions. There had been occasions of waiver, which NEQS, in their dealings with the bank, had established as a course of conduct and had relied upon, which ties in, Your Honors, with the other agreement, or with the other argument regarding the preliminary agreement between the parties. NEQS had believed that these ratios were not as important due to the fact that there was a preliminary agreement based on projections, based upon projections, Your Honor, that the defendants relied upon regarding this preliminary agreement that would have involved three different things. The shredder loan, so-called, which is a big machine, that was actually closed. The shredder loan actually was closed. The second component was the financing by the bank of the purchase of five transfer stations in the state of New York. And the companies, which would have provided additional security to the bank and would have provided better terms to the appellants. They point to the fact that a number of conditions would have had to have been met prior to the financing being extended. And they also point to the county administrator's testimony that there was no price that had been agreed upon with respect to the transfer stations. The material terms were not agreed upon and certain conditions needed to be met. The preliminary agreement is obviously not the final agreement. The preliminary agreement does not bind the parties to the specific agreement. You have an agreement on material terms, don't you? How can you have a preliminary agreement if there's no agreement on price, there's no agreement on boundaries? There had been substantial efforts and actions taking place, including appraisals of the hazard reviews and that sort of thing. There had been a number of discussions between the bank and NEQS regarding these preliminary agreements. And what a preliminary agreement does, Your Honor, it doesn't bind the company to a specific agreement. But it means you cannot simply walk away without making good faith efforts to the bank. The bank failed to act in good faith when it came in and placed the loans in special assets group, or SAG. Mr. McDermott, who was the bank's SAG officer in charge of the case, testified that he never made any attempts to acquaint himself with the relationships between the parties. He never made any attempts to work out an agreement with the party. He never made any attempts to determine the going forth business. His job was simply to get out of the business of NEQS. And it is submitted that under the terms of, under the preliminary agreement that we believe did have substantial material agreement, that such... And what is your, the primary evidence on which you're relying to say that, I mean, it's clear that the parties had discussions between 2012 and 2015. It's clear that they discussed potentially the financing for these transfer stations and that they discussed maybe they'd put all the loan obligations into a single loan. But what can you point to that is the evidence that suggests that there was a preliminary agreement, this tripartite lending arrangement? Well, first of all, there was the consummation of the Schrader loan, which is, of course, the main component of the whole deal. That's your main piece of evidence. And that is the main piece of evidence, as well as the communications with the parties and as well as, and the bank indicates that the credit approvals, records and memoranda were not provided to the, to NEQS. We certainly agree. But what it does show is the bank's preliminary agreement and to make this agreement, creating a situation where they were not simply free to walk away without good faith negotiation. I just briefly, the duress issue is quite extensively briefed regarding Mr. Elnicki's issues with Scott Card. Those issues are undisputed. Fundamental question about the duress issue. It seems like you're claiming duress as to the February 13, 2015 loan. Is that? That is correct. They cite to the fact in the, to the district court, there was a statement that we're not disputing that loan, that special appendix 12, supplement appendix 1231. So what's your response to that? I looked at that and that was said, we're not disputing. It's a misunderstanding. We're not disputing that loan. What's your response to that? Well, my, my response to that, Your Honor, is it was a modification of the existing agreement. So it was a different note. It was a different matter. And it is also evidence of the bank's attitudes towards it. Why was the district court told that we're not disputing that loan? And now you're saying it was under duress. I don't understand that. Well, I mean, I don't have a good explanation for you to that specific question, Your Honor, because the, the, the duress came, which infected the entire agreement between the parties, because Mr. Card said that the shredder loan would also be done at the time that, of that closing. And the shredder loan, of course, was a state, was not part of that modification, Your Honor. The shredder loan was the biggest component of this agreement. And that is why we believe the duress agreement continues to have legs. Thank you, Your Honor. Good morning. Daniel Flores, Wilson, Elser, Moskowitz, Edelman, and Dicker on behalf of Plaintiff Appellee, Bank of America. May it please the court, Your Honor, start with the issues. Our papers make clear, and the district court correctly found, that there was never any waiver of the, the, the key covenant, the, which I'll call the fixed charge coverage ratio covenant, the FCCR covenant, for shorthand, in this case. There were, the, there's not, there's no issue here that the bank didn't enforce it timely. They concede, and everyone concedes for the record, that the bank did promptly enforce it the first time that it occurred in, for the quarter ending June 30, 2015, in a, in a notice letter dated August 25th. So there's no issue of delay or the bank sitting on its rights. The argument that they make is even more baseless in the sense that they argue that the waiver of other defaults on other loans to a different borrower somehow amounts to an implied waiver of the bank's right under eight separate credit facilities to assert any defaults. In fact, as the court has pointed out earlier, this would preclude a bank that waives any kind of any default on any aspect of a credit relationship from ever defaulting that loan on a go-forward basis. That can't be the law, because in reality, waivers happen all the time, and I certainly don't think the courts would want to discourage banks from doing so. So they point to, as I said, three other covenant waivers, and I think the court noted that earlier. One was, two were out-of-debt covenants. One occurred in 2013. One occurred in 2014. Those are simply covenants that say you have to pay down a lot of credit to zero for a period of time in order to show that you can pay the debt. Those were two-year-old waivers on a different loan to a different borrower. It wasn't even the same borrower. It wasn't even the same loan. And then there was one further waiver of a debt-to-worth covenant that occurred in 2015. Again, different borrower, different loan. Totally not the basis, we don't think, for a reasonable inference that the bank had impliedly waived the right to pay the debt-to-worth covenants. One of the papers, and I think we heard it briefly today, is that by the bank extending more money when the ratio, they argue, was sort of blown out of the water at that point, was somehow an implicit waiver. What's your response to that? Well, it's actually false. The documentary record shows that the companies submitted numerous compliance certificates, at least two of which were after the Schroeder loan had been made, in which they represented to the bank, and the bank agreed that they were compliant. The record shows that they did comply, that the covenant was achievable, and they, in fact, achieved it and represented to the bank that they were in compliance for two quarters after the closing of the Schroeder loan. So the notion, and this goes to their experts in possibility theory, that the covenant was impossible to meet is just false. The documentary record proves that, and I think the district court correctly noted that as well. They also referred to maturity extensions that occurred throughout the relationship. Those extensions were all in writing, as were all of the covenant waivers. They were all documented in writing. There was nothing implied about it. They went through the credit committee approval process. They were all documented properly. The extensions, the maturity extensions, again, were for different loans and were all in writing, and all occurred before there was any maturity default. So they weren't even waivers. They're mixing apples and oranges and calling them waivers. They were just straight extensions of the maturity date. So that also could not be the basis for an implied waiver. With respect to their duress claim, this claim is based on the thinnest of allegations of a record, if you want to call it that, based solely on the testimony of the defendant's principal, Mr. Elnicky. He makes general allegations, generalized allegations, that he was berated, cursed at at a closing. But what the defendants don't point out is that, and I think the court noted earlier, this was a refinance of a preexisting debt. They were already liable for this debt. The sole purpose of the refinance was to benefit the defendants at their request to give them a more flexible payment schedule, which they got. They took a $45,000 a month payment and made it essentially a seasonal principal payment, where they only had to make principal interest payments for six months out of the year to coincide with their busy season. In other words, they wanted to match the payments to their cash flow needs. Perfectly simple explanation for the loan. So even if there was, and I'm not conceding there absolutely was no duress, they were eager to close this loan. They requested it. The text messages in the record reflect that Mr. Elnicky was peppering the bank officer with text messages about, when are we going to close? What are the terms? I'm comparing it to a prior loan agreement. Why is this in there? He reviewed the documents in advance of the closing. That is crystal clear from the record. And factually, there's no basis for the claim that there was any duress. But ultimately, it was a refinance. If the court were to set aside and find duress, they're still liable for the debt. They don't get away from repaying the $2.54 million, which they acknowledge they were already liable for in advance of that closing. And finally, on that point, there's a clear ratification because they accepted the benefits of the transaction. Assuming Mr. Elnicky felt he had been mistreated or maltreated at the closing, not treated professionally, where was the subsequent action to raise that issue, to complain? What specific terms in that re-documentation, in that refinance, are they complaining about? We don't know because they were happy with the terms. So how were they harmed? There's no possible damages. And they ratified the loan by not raising any claims. You're saying that if this refinancing agreement were wiped out, what remains is the pre-existing loan conditions that they were liable for? Correct, Your Honor. And as an equitable matter, they would have to repay that debt. You don't just get to not repay the debt on the money that you acknowledge receiving. As to the preliminary agreement, they refer to it as a tripartite agreement. This is a fabrication. There's no document, there's no evidence in the record of a so-called tripartite agreement. It's a story that they've invented to create the impression that the Schroeder loan and the There clearly were discussions. They're reflected in various approvals over the years for the defendants to acquire certain real estate, five transfer stations in Washington County, New York. That certainly was discussed. And their desire to purchase those properties was discussed. It's reflected in the approvals. But as the approvals reflect, there were substantial contingencies before we get to a discussion about a real estate mortgage loan and actual consummation of that loan. And there were many open terms that would have to be addressed, as in the case of any real estate acquisition. And as the Court noted earlier, many of those terms were never even agreed to. They never exercised the purchase option that they needed to exercise because they were leasing the properties and they had a purchase option. The Washington County Administrator testified at deposition that they never even in April of 17 when that deposition took place. They never agreed on the price. They were still negotiating the price. This is nearly two years after the defaults had occurred and we were in the middle of extensive litigation. They never agreed on the meets and bounds. They never obtained the permits that were required. And if we look at the case of Miller versus Fliegenheim, if you look at the four elements of Miller, one is an express preservation of rights. In this case, the only documents they could point to to show that there was any preliminary agreement were internal bank documents that they never saw. They never even saw those documents, so how could they have reasonably relied on them? And you wouldn't expect to have an express reservation of rights in an internal bank document. It would be illogical. But all of the other three standards, including the clear terms that you'd have to have an agreement on, the basic terms of the transaction, and whether this is typically a transaction that is documented in writing, all clearly demonstrate that they do not meet the Miller standard and that there's no evidence whatsoever of the preliminary agreement that they allege to have met the Miller standard. And Mr. Bertrand, do you have rebuttal? No. All right, well, we'll take the case as submitted and we'll take it under advisement. Thank you both for your arguments.